## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Renal Glover and Claudia Musella, individually and on behalf of all others similarly situated,<br><br>  Plaintiffs,<br><br>  - against -<br><br>Bob's Discount Furniture, LLC and Guardian Protection Products, Inc.,<br><br>  Defendants | 1:20-cv-10924-JGK<br><br><br>First Amended Class Action Complaint<br><br><br>Jury Trial Demanded |

Plaintiffs allege upon information and belief, except for allegations pertaining to plaintiffs, which are based on personal knowledge:

1.    Bob's Discount Furniture, LLC ("Bob's" or "defendant Bob's") markets, promotes and sells insurance under the guise of "service contracts," referred to as "Goof Proof Protection" ("Goof Proof" or "Product"), and administered by Guardian Protection Products, Inc. ("Guardian" or "defendant Guardian"), in connection with its sale of furniture.

2.    A description of the Goof Proof plan is provided in small print in documents provided to consumers with their purchase receipts:

**Goof Proof Protection…**

Bob's Goof Proof is the best way to protect your investment from *a wide variety of accidents* for 5 years... If you purchased a Goof Proof Protection Plan and *accidentally stain or damage* your furniture then please report the mishap within 30 days of the accident. Call Guardian at (800) 538-9500 to report accidental stains or damage to your furniture. Call FabricTech at (800) 758-8563 to report accidental stains or damage to your mattress. (emphasis added).

3.    When purchasing tangible goods, consumers often rely upon product warranties by

the seller to guard against possible future repair costs.[1]

4.      However, manufacturers and retailers have intensified the sale of product guarantees such as extended warranties and service contracts which lengthen the term of a product's usual guarantee.

5.      Moreover, independent corporations which neither manufacture nor sell consumer products have begun to solicit third party service contracts to consumers.

6.      Such service contracts are intended to fulfill the purpose of an extended warranty by providing either actual repair or replacement or by offering financial reimbursement for the necessary repair or replacement of consumer products.

7.      Abuse in the sale and performance of product guarantees sold by third parties – sometimes through the immediate or retail seller – has come to the attention of both state and federal regulators.

8.      Legislative and administrative bodies have been concerned that third parties, who neither sell nor manufacture the guaranteed product, may fail to disclose essential coverage terms, refuse to cover expenses under the contract, or decline to provide adequate service for the product guaranteed.

9.      The increasing sales of third-party product guarantees presents the legal community with significant issues involving consumer protection and insurance law.

10.     To offer insurance agreements, a corporation must possess a minimum level of assets and create a reserve fund from the insurance premiums which it collects.

11.     A company selling insurance is required to be registered with New York State and prove it has sufficient financial capacity to honor its promises to consumers.

---

[1] Samini, Keyvan. "Third Party Extended Warranties and Service Contracts: Drawing the Line Between Insurance and Warranty Agreements." *Ohio St. LJ* 54 (1993): 537.

12.    Compliance with state insurance regulations is a difficult task, perhaps intentionally.

13.    If it were simple and quick to establish a company to sell insurance, the number of fly-by-night operators would proliferate, to the detriment of consumers.

14.    As a result, many corporations which provide agreements amounting to product insurance take steps to characterize such relationships as service contracts or warranties rather than insurance.

15.    Companies who sell extended warranties and service contracts spend between four and fifteen cents of each dollar collected for service-the rest is profit.

16.    Entities which sell product guarantees have no incentive to create a reserve fund which will cover their contractual obligations should they become insolvent.

17.    The inability to fulfill policy obligations was one of the prime rationales for instituting insurance regulation decades ago.

18.    The arrangement between Defendant Bob's and Defendant Guardian is a hybrid one, because Defendant Guardian is not a manufacturer or retailer.

19.    However, through partnership with Defendant Bob's, Defendant Guardian has realized the lucrative prospects of selling product guarantees.

20.    The insurance industry is subject to significant regulation primarily because the whole value of the promise sold to the public by insurers lies in future performance.

21.    The insurer is liable on the policy only upon the happening of a fortuitous event. As a result, it becomes difficult for the insured to value the contract.

22.    A private individual's access to information is limited and his potential for becoming the focus of financial abuse is inflated.

23.    The same dangers arise when third parties attempt to offer guarantee agreements for

consumer products.

24.     The idea that providers of third-party product guarantees should meet the same standards as those imposed upon the insurance industry is necessary to prevent operation of companies which collect premiums but largely deny claims.

25.     Defendant Bob's sells purported third-party obligor service contracts on behalf of Defendant Guardian.



26.     These third-party obligor service contracts satisfy all elements of the common

definition of insurance.

27.    An "insurance contract" is defined as:

> any agreement or other transaction whereby one party, the "insurer", is obligated to confer benefit of pecuniary value upon another party, the "insured" or "beneficiary", dependent upon the happening of a fortuitous event in which the insured or beneficiary has, or is expected to have at the time of such happening, a material interest which will be adversely affected by the happening of such event.

NY Insurance Law ("ISC") § 1101(a)(1).

28.    A "Fortuitous event" means "any occurrence or failure to occur which is, or is assumed by the parties to be, to a substantial extent beyond the control of either party." ISC § 1101(a)(2).

29.    Defendant Bob's policies, terms, conditions, pamphlets, and other materials are unambiguous: Goof Proof is marketed as intended "to protect your investment from a wide variety of **accidents** for 5 years." (emphasis in original).

30.    Defendant Guardian, upon information and belief, collaborates with Defendant Bob's in drafting the language and marketing material for the Goof Proof plans.

31.    Defendant Bob's describes the Goof Proof plans as a "service contract."

32.    N.Y. Ins. Law § 7902(k) defines the term "service contract" as follows:

> (k) a contract or agreement, for a separate or additional consideration, for a specific duration to perform the repair, replacement or maintenance of property, or indemnification for repair, replacement or maintenance, due to a defect in materials or workmanship or wear and tear, with or without additional provision for indemnity payments for incidental damages, provided any such indemnity payment per incident shall not exceed the purchase price of the property serviced.

> Service contracts may include towing, rental and emergency road service, and may also provide for the repair, replacement or maintenance of property for damage resulting from power surges and accidental damage from handling. Service contracts may also include contracts to repair, replace or maintain residential appliances and systems.

33.    A service contract *may* include contracts to repair, replace or maintain property.

34.    According to the Office of General Counsel, New York State Department of Financial Services ("DFS"):

> A service contract cannot provide "coverage for loss or damage arising out of an external cause except for the limited circumstances as provided for in § 7902(k), which provides, in pertinent part that a service contract may also provide coverage for the repair, replacement or maintenance of property for damage resulting from "accidental damage from handling" and "damage resulting from power surges."

OGC Op. No. 06-01-18.

35.    The phrase "accidental damage from handling" has been interpreted to mean "accidental damage from handling in the normal and customary use of the product."

36.    Facially, this appears to conform with the Goof Proof plan, which is based on "accidental damage" to the covered furniture.

37.    However, "coverage for accidental damage from handling [or power surges] may be available *only* as an incidental coverage to defect coverage and, as such, coverage may not provide greater coverage than the defect coverage, with respect to both the length of the term and the scope of the coverage, whether offered under one contract or as separate agreements." OGC Op. No. 06-01-18.

38.    Plaintiff Musella purchased the Phoenix Power Recliner[2], from Defendant Bob's store, located at 171-175 Old Country Road, Carle Place, New York.

---

[2] PWR RECLINER 1542-31 BROWN PHOENIX, Article # 20031794005.



39.    Plaintiff Musella purchased this chair on September 2, 2017, for $699.99, excluding tax.

40.    Plaintiff Musella also purchased Goof Proof, for $99.99, FCP-BD-1PO5 GOOF PROOF KIT, Article # 19700002.

41.    In or around December 2019, Plaintiff Musella observed small tears in the fabric of the chair, in the back of the chair where one's back rests.

 

42.    Plaintiff Musella, or her authorized representative, contacted Defendant Bob's about the tears.

43.    Based on information understood by Plaintiff Musella, a representative of Defendant Bob's or Defendant Guardian, arrived to inspect the chair on Friday, December 27, 2019.

44.    On December 30, 2019, a representative of Defendant Bob's, Diane N., informed Plaintiff Musella, or her authorized representative, that:

> We have completed a thorough review of your account history, as well as the details of your claim regarding your Phoenix Power Recliner, in addition to any applicable warranties.

> After careful review, we can see that this concern is not covered by any warranty. The merchandise came with a one-year warranty against manufacturing defects. That year ended on September 11, 2018.

> While our goal is to find every opportunity to satisfy our Customers, I am sorry that in this case, we cannot honor your claim. It is never our intent to disappoint a Customer, and again we want to apologize that we could not meet your

expectations. Thank you for your understanding.

45.    Plaintiff Musella requested that Defendant Bob's reconsider its denial of coverage,

based on her purchase of the Goof Proof plan.

46.    However, on December 31, 2019, another representative of Defendant Bob's, Felicia

B., responded:

> We have completed a thorough review of your account history, as well as the details of your claim. At the time of purchase, you were sold Goof Proof, however it was not Goof Proof Plus. Goof Proof Plus was no longer sold after May of 2017.
>
> Your merchandise came with a one year warranty against any manufacturing defects.
>
> The Goof Proof covers your merchandise for up to 5 years from the date of delivery against any one time damages that have resulted from a single incident.
>
> While it is our goal to satisfy every Customer, after careful consideration, it is our belief that this decision is appropriate and the claim has now been closed. We appreciate your understanding.

47.    The Goof Proof service contract purported to provide coverage from "accidental

damage,"

48.    New York prohibits the sale of "a service contract providing accidental damage from

handling [or power surge] coverage may not be offered except as part of, or in conjunction with, a

service contract providing defect or wear and tear coverage."

49.    Defendant Bob's and Defendant Guardian provided a "One Year Guarantee" when

Plaintiffs purchased their furniture.

**Bob's One Year Guarantee**

I am proud of the reputation we have of providing excellent service to our customers. I want you to know that my new products are guaranteed to be free of factory defects for one year from the date of delivery or pick up. My mattresses and motion furniture may carry additional factory guarantees. Except for brand new/factory fresh Pit items, my Pit or clearance merchandise is excluded from my factory defect guarantees. Normal wear and tear or customer-caused problems are also excluded. Service can only be provided within our serviceable area to the original purchaser.

I am proud of the reputation we have of providing excellent service to our customers. I want you to know that my new products are guaranteed to be free of factory defects for one year from the date of delivery or pick up. My mattresses and motion furniture may carry additional factory guarantees. Except for brand new/factory fresh Pit items, my Pit or clearance merchandise is excluded from my factory defect guarantees. Normal wear and tear or customer-caused problems are also excluded. Service can only be provided within our serviceable area to the original purchaser.

50. Defendant Bob's is and was permitted to offer coverage for accidental damage as part of its one-year warranty for an additional fee to consumers.

51. However, since the purported protection against accidental damage to the furniture was provided separate from the one-year warranty, the sale of the Goof Proof plans were prohibited.

52. DFS considered a similar scenario, where a company wanting to offer a Paintless Dent Repair Protection Plan inquired if such a plan was "a service contract for purposes of Article 79 of the Insurance Law." OGC Op. No. 07-09-02.

53. DFS determined that the "proposed Paintless Dent Repair Protection Plan is not a service contract for purposes of Article 79 of the Insurance Law; rather, it constitutes an insurance

contract and the doing of an insurance business under N.Y. Ins. Law § 1101."

54.    The provider sought to market service agreements that provide coverage to repair small dings and dents on automobiles, and "characterized these dings and dents as occurring due to normal wear and tear."

55.    DFS recognized the relevance of Insurance Law § 7902(k), which defines a "service contract" as an agreement, for additional consideration, to perform repair or maintenance due to reasons which include "a defect in materials or workmanship or wear and tear."

56.    It concluded that the "accidental" "dings and dents" were due to the occurrence of "'fortuitous events,' as defined by Insurance Law § 1101," which provides: "'Fortuitous event' means any occurrence or failure to occur which is, or is assumed by the parties to be, to a substantial extent beyond the control of either party."

57.    A purported service contract – like Goof Proof or the Paintless Dent Repair Protection Plan:

> may not provide coverage for loss or damage arising out of an external cause except in the limited circumstances set forth in Insurance Law § 7902(k), which states that a service contact may provide coverage for the repair, replacement or maintenance of property for damage resulting from "accidental damage from handling."

> The Insurance Department has interpreted "accidental damage from handling" to mean accidental damage from handling in the normal and customary use of the product (here, the automobile). See Opinions of Office of General Counsel No. 06-03-04 (March 8, 2006) and No. 07-07-19 (July 23, 2007).

> However, coverage for accidental damage from handling may be made available only as incidental to coverage for defects. Id. In the instant matter, no coverage is being afforded for defects, so accidental damage from handling may not be covered.

58.    The purpose of this prohibition is to guard against the harm suffered by Plaintiffs and consumers.

59.    Since Goof Proof is based on the occurrence of admittedly "fortuitous events," New York concluded that these types of plans are contracts of insurance.

60.    To permit the sale of products which are tantamount to insurance but without the protections and restrictions imposed on insurance contracts, is a public harm the legislature sought to prevent.

61.    The experiences of Plaintiffs fit squarely within the policy rationale for limiting the scope of service contracts for "accidental damage."

62.    This is because the issuing and insuring parties – Defendant Bob's and Defendant Guardian – can deny coverage to customers based on almost any basis.

63.    Rips, tears and punctures are described by Defendant Bob's and Defendant Guardian as "defects" for which Plaintiffs and class members were denied coverage.

64.    Plaintiffs and class members purchased purported service contracts to protect their furniture against "accidental damage."

65.    DFS considered damages to fabric and leather being due to wear and tear or fortuity.

66.    While repeatedly getting into and up from a chair may cause wear over time, DFS recognized that a rip or tear or separation of material could occur due to a buckle or piece of a person's clothing digging into or catching onto the fabric, causing damage.

67.    The latter scenario is fortuitous and would trigger classification of the service contract as an insurance contract.

68.    The leather situation is what occurred to Plaintiff Musella's chair.

69.    The leather was not ripped due to wear and tear, but due to the inadvertent attachment of clothing from a person using the chair, which became stuck, causing a small separation in the leather and fabric.

70.    This initial separation triggered the larger tear.

71.    The discount nature of the furniture creates extra incentive to purchase the Goof

Proof products.

72.    This is because consumers know intuitively that lower-priced furniture may not be as sturdy or resistant to accidental stains or tears as higher-priced furniture.

73.    Therefore, it makes sense to spend extra on a warranty to cover these potential issues.

74.    Upon information and belief, Defendant Bob's receives incentives from Defendant Guardian for every warranty it sells to consumers.

75.    Defendant Bob's sales personnel receive bonuses for the number of Goof Proof products they sell.

76.    Defendant Bob's sales personnel can be penalized if they do not sell a specific number of Goof Proof products during a time-period.

77.    This creates an incentive for personnel to give consistently false misrepresentations about the nature, type and extent of the Goof Proof products.

78.    The salesperson who sold the warranty to Plaintiffs told them that the Goof Proof protection they purchased would cover issues such that they experienced.

79.    Since the furniture is not of the highest quality, the Goof Proof plans are especially misleading and deceptive.

80.    This means Defendant Bob's and Defendant Guardian can more easily and unfairly attribute any accidental stain or rip to a product defect, when there might be cause for overlap between what caused the damage.

81.    However, when customers submit claims for one of the covered reasons, they are denied with the explanation that the damage or stain was not "accidental," but due to misuse.

82.    Defendant Bob's and Defendant Guardian regularly deny claims if a customer cannot identify the exact date within a 30-day period when a stain or damage occurred.

83.    Not noticing a stain or damage on the day it occurred is a common circumstance, especially if the furniture is used by other persons within a household and not exclusively by the person who purchased the Goof Proof product or their authorized representative.

84.    Additionally, if there is more than one marking or puncture on the furniture, the claim will be denied on the basis that the item was "misused."

85.    However, it is not expected that a customer would submit a claim for the most minor and less visible markings or tears.

86.    Defendant Bob's and Defendant Guardian regularly deny claims based on the issue being categorized as "accumulated [stains/tears/etc]," "repetitive" or "preventable."

87.    Customers submit pictures of the items for which coverage is sought, and Defendant Bob's and Defendant Guardian will seek to identify other markings or rips, even in other areas of the furniture, and deny claims on this basis.

88.    Defendant Bob's and Defendant Guardian have not reasonably defined what types of stains, rips, etc., are "excessive" and the application of this criteria results in denial of valid claims.

89.    Defendant Bob's and Defendant Guardian encourage consumers to use cleaning products sold and/or provided by Defendant Bob's, to attempt to remedy stains or markings.

90.    This delays the time within which customers file their claims, resulting in filing dates beyond the permitted 30 days.

91.    When consumers do submit claims, they face long waits to speak with representatives, are told they will be contacted by someone, and no one calls back.

92.    Calls by consumers such as Plaintiffs are often "disconnected" because the representatives of Defendant Bob's and Defendant Guardian are evaluated on the length of their

calls with claimants.

93.    Customers must navigate confusing endless circular phone trees which lead to being disconnected.

94.    Defendant Bob's and Defendant Guardian's actions – the sale of insurance contracts as service contracts – causes harm to Plaintiffs and class members.

95.    Reasonable consumers must and do rely on a company to honestly identify and describe the components, attributes and features of a product or service being sold, relative to itself and other comparable products or alternatives.

96.    The value of the Goof Proof Products that plaintiffs purchased was materially less than its value as represented by Defendant Bob's and backed up by Defendant Guardian.

97.    Defendant Bob's sold more of the Goof Proof Products, and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

98.    Defendant Guardian reaped greater profits based on Defendant Bob's sale of more Goof Proof plans.

99.    Had Plaintiffs and proposed class members known the truth, they would not have bought the Goof Proof plans or would have paid less for it.

<u>Jurisdiction and Venue</u>

100.    Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

101.    Upon information and belief, the aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

102.    Plaintiff Glover is a citizen of New York.

103.  Defendant Bob's Discount Furniture, LLC is a Delaware corporation with a principal place of business in Stamford, Fairfield County, Connecticut and upon information and belief, at least one member of defendant is not a citizen of the same state as the plaintiff Glover.

104.  The parties are citizens of different states.

105.  Venue is in this district because a substantial part of the events or omissions giving rise to the claim occurred here, Plaintiff Glover's purchase of furniture from Defendant Bob's and the Goof Proof plan from Defendant Bob's and Defendant Guardian.

Parties

106.  Plaintiff Glover is a citizen of Bronx, Bronx County, New York.

107.  Plaintiff Musella is a citizen of Hewlett, Nassau County, New York.

108.  Defendant Bob's Discount Furniture, LLC, is a Delaware limited liability company with a principal place of business in Stamford, Connecticut, Fairfield County.

109.  Defendant Guardian Protection Products, Inc., is a North Carolina corporation with a principal place of business in North Carolina.

110.  Plaintiffs relied on the representations that the Goof Proof plans would cover the incidents on which they sought coverage.

111.  Plaintiffs would not have purchased the Goof Proof plans if they knew the representations were false and misleading.

112.  The Goof Proof plans were worth less than what Plaintiffs paid and they would not have paid as much absent the false and misleading statements and omissions.

113.  Plaintiffs intend to, seek to, and will purchase the Goof Proof plans again when they can do so with the assurance that the representations are consistent with what they will receive.

<u>Class Allegations</u>

114.  The class will consist of New York residents who purchased the Goof Proof plans during the statutes of limitations for each cause of action alleged.

115.  Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiffs and class members are entitled to damages.

116.  Plaintiffs' claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

117.  Plaintiffs are adequate representative because their interests do not conflict with other members.

118.  No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

119.  Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

120.  Plaintiffs' counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

121.  Plaintiffs seek class-wide injunctive relief because the practices continue.

<u>New York General Business Law ("GBL") §§ 349 & 350</u>

<u>(Consumer Protection Statute)</u>

122.  Plaintiffs incorporate by reference all preceding paragraphs.

123.  Defendant Bob's and Defendant Guardian's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

124.  Defendant Bob's misrepresented the Goof Proof plans through statements,

omissions, ambiguities, half-truths and/or actions.

125.  Defendant Guardian abetted the misrepresentations made by Defendant Bob's, by, upon information and belief, furnishing material and talking points, to be used by salespersons to sell more Goof Proof products.

126.  Plaintiffs relied on the representations.

127.  Plaintiffs and class members would not have purchased the Goof Proof plans or paid as much if the true facts had been known, suffering damages.

<u>Breach of Contract</u>

128.  Defendant Bob's and Defendant Guardian created contracts with Plaintiffs.

129.  The contracts were for the sale of insurance in the form of service contracts.

130.  Defendant Bob's and Defendant Guardian breached the insurance contracts with Plaintiffs by denying their claims for coverage.

<u>Breach of Express Warranty,
Implied Warranty of Merchantability and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.</u>

131.  The Goof Proof plans were marketed and sold by defendant Bob's, with assistance from Defendant Guardian, and expressly and impliedly warranted to plaintiffs and class members as able to cover the events they sought coverage for.

132.  Defendant Bob's and Defendant Guardian had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Goof Proof plans.

133.  This duty is based on Defendant Bob's and Defendant Guardian's outsized role in the market for this type of "service contract."

134.  Plaintiffs provided or will provide notice to Defendant Bob's and Defendant Guardian's, their agents, representatives, retailers and their employees.

135.  Defendant Bob's and Defendant Guardian received notice and should have been

aware of these issues due to complaints by regulators, competitors, and consumers, to their main offices.

136.    The Goof Proof plans did not conform to their affirmations of fact and promises due to Defendant Bob's and Defendant Guardian's actions and were not merchantable because they were not fit to pass in the trade as advertised.

137.    Plaintiffs and class members would not have purchased the Goof Proof plans or paid as much if the true facts had been known, suffering damages.

<u>Negligent Misrepresentation</u>

138.    Defendant Bob's and Defendant Guardian had a duty to truthfully represent the Goof Proof plans, which it breached.

139.    This duty is based on defendant Bob's and defendant Guardian's position, holding themselves out as having special knowledge and experience this area.

140.    The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in defendant Bob's and defendant Guardian.

141.    Plaintiffs and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Goof Proof plans.

142.    Plaintiffs and class members would not have purchased the Goof Proof plans or paid as much if the true facts had been known, suffering damages.

<u>Fraud</u>

143.    Defendant Bob's and Defendant Guardian misrepresented and/or omitted the attributes and qualities of the Goof Proof plans.

144.  Defendant Bob's and Defendant Guardian's fraudulent intent is evinced by its knowledge that the Goof Proof plans were not consistent with its representations.

Unjust Enrichment

145.  Defendant Bob's and Defendant Guardian obtained benefits and monies because the Goof Proof plans was not as represented and expected, to the detriment and impoverishment of plaintiffs and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiffs demand a jury trial on all issues.

 **WHEREFORE**, Plaintiffs pray for judgment:

1.  Declaring this a proper class action, certifying plaintiffs as representatives and the undersigned as counsel for the class;

2.  Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3.  Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4.  Awarding monetary damages, statutory damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5.  Awarding costs and expenses, including reasonable fees for plaintiffs' attorneys and experts; and

6.  Other and further relief as the Court deems just and proper.

Dated:   July 7, 2021

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
60 Cuttermill Rd Ste 409
Great Neck NY 11021-3104
Tel: (516) 268-7080
Fax: (516) 234-7800
spencer@spencersheehan.com