## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Renell Glover and Claudia Musella, individually and on behalf of all others similarly situated, | 1:20-cv-10924-JGK |
| Plaintiffs, | |
| - against - | Second Amended Class Action Complaint |
| Bob's Discount Furniture, LLC and Guardian Protection Products, Inc., | Jury Trial Demanded |
| Defendants | |

Plaintiffs allege upon information and belief, except for allegations pertaining to plaintiffs, which are based on personal knowledge:

1.     Bob's Discount Furniture, LLC ("Bob's" or "Defendant Bob's") markets, promotes, and sells insurance under the guise of "service contracts," referred to as "Goof Proof Protection" ("Goof Proof" or "Product"), and administered by Guardian Protection Products, Inc. ("Guardian" or "Defendant Guardian"), in connection with its sale of furniture.

2.     A description of the Goof Proof plan is provided in small print in documents provided to consumers with their purchase receipts:

**Goof Proof Protection…**

Bob's Goof Proof is the best way to protect your investment from *a wide variety of accidents* for 5 years... If you purchased a Goof Proof Protection Plan and *accidentally stain or damage* your furniture, then please report the mishap within 30 days of the accident. Call Guardian at (800) 538-9500 to report accidental stains or damage to your furniture. Call FabricTech at (800) 758-8563 to report accidental stains or damage to your mattress. (emphasis added).

3.     When purchasing tangible goods, consumers often rely upon product warranties by

the seller to guard against possible future repair costs.[1]

4.    However, manufacturers and retailers have intensified the sale of product guarantees such as extended warranties and service contracts which lengthen the term of a product's usual guarantee.

5.    Moreover, independent corporations which neither manufacture nor sell consumer products have begun to solicit third party service contracts to consumers.

6.    Such service contracts are intended to fulfill the purpose of an extended warranty by providing either actual repair or replacement or by offering financial reimbursement for the necessary repair or replacement of consumer products.

7.    Abuse in the sale and performance of product guarantees sold by third parties – sometimes through the immediate or retail seller – has come to the attention of both state and federal regulators.

8.    Legislative and administrative bodies have been concerned that third parties, who neither sell nor manufacture the guaranteed product, may fail to disclose essential coverage terms, refuse to cover expenses under the contract, or decline to provide adequate service for the product guaranteed.

9.    The increasing sales of third-party product guarantees presents the legal community with significant issues involving consumer protection and insurance law.

10.    To offer insurance agreements, a corporation must possess a minimum level of assets and create a reserve fund from the insurance premiums which it collects.

11.    A company selling insurance is required to be registered with New York State and prove it has sufficient financial capacity to honor its promises to consumers.

---

[1] Samini, Keyvan. "Third Party Extended Warranties and Service Contracts: Drawing the Line Between Insurance and Warranty Agreements." *Ohio St. LJ* 54 (1993): 537.

12.    Compliance with state insurance regulations is a difficult task, perhaps intentionally.

13.    If it were simple and quick to establish a company to sell insurance, the number of fly-by-night operators would proliferate, to the detriment of consumers.

14.    As a result, many corporations which provide agreements amounting to product insurance take steps to characterize such relationships as service contracts or warranties rather than insurance.

15.    Companies who sell extended warranties and service contracts spend between four and fifteen cents of each dollar collected for service-the rest is profit.

16.    Entities which sell product guarantees have no incentive to create a reserve fund which will cover their contractual obligations should they become insolvent.

17.    The inability to fulfill policy obligations was one of the prime rationales for instituting insurance regulation decades ago.

18.    The arrangement between Defendant Bob's and Defendant Guardian is a hybrid one, because Defendant Guardian is not a manufacturer or retailer.

19.    However, through partnership with Defendant Bob's, Defendant Guardian has realized the lucrative prospects of selling product guarantees.

20.    The insurance industry is subject to significant regulation primarily because the whole value of the promise sold to the public by insurers lies in future performance.

21.    The insurer is liable on the policy only upon the happening of a fortuitous event. As a result, it becomes difficult for the insured to value the contract.

22.    A private individual's access to information is limited and his potential for becoming the focus of financial abuse is inflated.

23.    The same dangers arise when third parties attempt to offer guarantee agreements for

consumer products.

24.    The idea that providers of third-party product guarantees should meet the same standards as those imposed upon the insurance industry is necessary to prevent operation of companies which collect premiums but largely deny claims.

25.    Defendant Bob's sells purported third-party obligor service contracts on behalf of Defendant Guardian.



26.    These third-party obligor service contracts satisfy all elements of the common

definition of insurance.

27.    An "insurance contract" is defined as:

any agreement or other transaction whereby one party, the "insurer", is obligated to confer benefit of pecuniary value upon another party, the "insured" or "beneficiary", dependent upon the happening of a fortuitous event in which the insured or beneficiary has, or is expected to have at the time of such happening, a material interest which will be adversely affected by the happening of such event.

NY Insurance Law ("ISC") § 1101(a)(1).

28.    A "Fortuitous event" means "any occurrence or failure to occur which is, or is assumed by the parties to be, to a substantial extent beyond the control of either party." ISC § 1101(a)(2).

29.    Defendant Bob's policies, terms, conditions, pamphlets, and other materials are unambiguous: Goof Proof is marketed as intended "to protect your investment from a wide variety of **accidents** for 5 years." (emphasis in original).

30.    Defendant Guardian, upon information and belief, collaborates with Defendant Bob's in drafting the language and marketing material for the Goof Proof plans.

31.    Defendant Bob's describes the Goof Proof plans as a "service contract."

32.    N.Y. Ins. Law § 7902(k) defines the term "service contract" as follows:

(k) a contract or agreement, for a separate or additional consideration, for a specific duration to perform the repair, replacement or maintenance of property, or indemnification for repair, replacement or maintenance, due to a defect in materials or workmanship or wear and tear, with or without additional provision for indemnity payments for incidental damages, provided any such indemnity payment per incident shall not exceed the purchase price of the property serviced.

Service contracts may include towing, rental and emergency road service, and may also provide for the repair, replacement or maintenance of property for damage resulting from power surges and accidental damage from handling. Service contracts may also include contracts to repair, replace or maintain residential appliances and systems.

33.    A service contract *may* include contracts to repair, replace or maintain property.

34.    According to the Office of General Counsel, New York State Department of Financial Services ("DFS"):

> A service contract cannot provide "coverage for loss or damage arising out of an external cause except for the limited circumstances as provided for in § 7902(k), which provides, in pertinent part that a service contract may also provide coverage for the repair, replacement or maintenance of property for damage resulting from "accidental damage from handling" and "damage resulting from power surges."

OGC Op. No. 06-01-18.

35.    The phrase "accidental damage from handling" has been interpreted to mean "accidental damage from handling in the normal and customary use of the product."

36.    Facially, this appears to conform with the Goof Proof plan, which is based on "accidental damage" to the covered furniture.

37.    However, "coverage for accidental damage from handling [or power surges] may be available *only* as an incidental coverage to defect coverage and, as such, coverage may not provide greater coverage than the defect coverage, with respect to both the length of the term and the scope of the coverage, whether offered under one contract or as separate agreements." OGC Op. No. 06-01-18.

**Plaintiff Glover's Facts**

38.    On February 16, 2017, Plaintiff Glover went to Defendant's store, 2500 Central Park Avenue, Yonkers, New York, 10710, to look at furniture.

39.    Plaintiff Glover purchased the Jennings Grey Power Reclining Sofa, Article 20023470003, for $998.00, with Goof Proof coverage.





40.    The first page of the sales receipt Plaintiff Glover received referenced Service/Part

Order 7867818 and identified her as Customer # 4630556. Exhibit "A."

41.    While Plaintiff Glover's receipt does not list a cost charged for the Goof Proof

protection, she had purchased the Goof Proof protection because the column corresponding to "Goof Proof" states "Accepted."

42.    Further, her correspondence with Defendant Guardian acknowledges she purchased Goof Proof for protection of the furniture she bought.

43.    In late November 2019, the frame of Plaintiff Glover's accidentally broke, which is damage of the type which was contracted for coverage under the Goof Proof Protection plan.

44.    Plaintiff Glover submitted her claim to Defendant Guardian and was assigned Claim Number 7231216.

45.    Defendant Guardian's representative requested that Plaintiff Glover submit additional information for the processing of her claim, which she did.

46.    On December 18, 2019, Defendant Guardian denied Plaintiff Glover's claim, stating:

Guardian Protection Products has processed the claim to your furniture. The damage you have reported is not eligible for coverage under your protection plan.

The plan you purchased from Bobs does cover your furniture for accidental frame breakage however your plan states all damages must be relatable to an accidental occurrence.

You reported that you did not know what caused the leaning against it , therefore the damage was deemed ineligible for coverage. Please see attached plan for details.

Please understand that this is a final determination and your claim cannot be changed or altered to change it's eligibility. To receive complete plan coverage in the future to the damaged area reported in this claim, you must have the reported stain or damage cleaned or repaired by a licensed technician and obtain a copy of that receipt. Responses to this email are not received.

**Plaintiff Musella's Facts**

47.    Plaintiff Musella purchased the Phoenix Power Recliner[2], from Defendant Bob's store, located at 171-175 Old Country Road, Carle Place, New York.

---

[2] PWR RECLINER 1542-31 BROWN PHOENIX, Article # 20031794005.



48.    Plaintiff Musella purchased the chair on September 2, 2017, for $699.99.

49.    Plaintiff Musella also purchased Goof Proof, for $99.99, FCP-BD-1PO5 GOOF PROOF KIT, Article # 19700002.

50.    Plaintiff Musella purchased the Phoenix Power Recliner[3], from Defendant Bob's

---

[3] PWR RECLINER 1542-31 BROWN PHOENIX, Article # 20031794005.

store, located at 171-175 Old Country Road, Carle Place, New York.

51.    In or around December 2019, Plaintiff Musella observed small tears in the fabric of the chair, in the back of the chair where one's back rests.

 

52.    Plaintiff Musella, or her authorized representative, contacted Defendant Bob's about the tears.

53.    Based on information understood by Plaintiff Musella, a representative of Defendant Bob's or Defendant Guardian, arrived to inspect the chair on Friday, December 27, 2019.

54.    On December 30, 2019, a representative of Defendant Bob's, Diane N., informed Plaintiff Musella, or her authorized representative, that:

> We have completed a thorough review of your account history, as well as the details of your claim regarding your Phoenix Power Recliner, in addition to any applicable warranties.
>
> After careful review, we can see that this concern is not covered by any warranty.

The merchandise came with a one-year warranty against manufacturing defects. That year ended on September 11, 2018.

While our goal is to find every opportunity to satisfy our Customers, I am sorry that in this case, we cannot honor your claim. It is never our intent to disappoint a Customer, and again we want to apologize that we could not meet your expectations. Thank you for your understanding.

55.    Plaintiff Musella requested that Defendant Bob's reconsider its denial of coverage, based on her purchase of the Goof Proof plan.

56.    However, on December 31, 2019, another representative of Defendant Bob's, Felicia B., responded:

We have completed a thorough review of your account history, as well as the details of your claim. At the time of purchase, you were sold Goof Proof, however it was not Goof Proof Plus. Goof Proof Plus was no longer sold after May of 2017.

Your merchandise came with a one year warranty against any manufacturing defects.

The Goof Proof covers your merchandise for up to 5 years from the date of delivery against any one time damages that have resulted from a single incident.

While it is our goal to satisfy every Customer, after careful consideration, it is our belief that this decision is appropriate and the claim has now been closed. We appreciate your understanding.

57.    Plaintiff Glover and Plaintiff Musella both had purchased the Goof Proof Protection plan from Defendant Bob's and administered by Defendant Guardian.

58.    For Plaintiff Glover and Plaintiff Musella, their claims were denied because Defendant Guardian characterized them as non-accidental.

59.    The Goof Proof service contract purported to provide coverage from "accidental damage,"

60.    New York prohibits the sale of "a service contract providing accidental damage from handling [or power surge] coverage may not be offered except as part of, or in conjunction with, a service contract providing defect or wear and tear coverage."

61.    Defendant Bob's and Defendant Guardian provided a "One Year Guarantee" when Plaintiffs purchased their furniture.



I am proud of the reputation we have of providing excellent service to our customers. I want you to know that my new products are guaranteed to be free of factory defects for one year from the date of delivery or pick up. My mattresses and motion furniture may carry additional factory guarantees. Except for brand new/factory fresh Pit items, my Pit or clearance merchandise is excluded from my factory defect guarantees. Normal wear and tear or customer-caused problems are also excluded. Service can only be provided within our serviceable area to the original purchaser.

62.    Defendant Bob's is and was permitted to offer coverage for accidental damage as part of its one-year warranty for an additional fee to consumers.

63.    However, since the purported protection against accidental damage to the furniture was provided separate from the one-year warranty, the sale of the Goof Proof plans was prohibited.

64.    DFS considered a similar scenario, where a company wanting to offer a Paintless Dent Repair Protection Plan inquired if such a plan was "a service contract for purposes of Article 79 of the Insurance Law." OGC Op. No. 07-09-02.

65.    DFS determined that the "proposed Paintless Dent Repair Protection Plan is not a

service contract for purposes of Article 79 of the Insurance Law; rather, it constitutes an insurance contract and the doing of an insurance business under N.Y. Ins. Law § 1101."

66.    The provider sought to market service agreements that provide coverage to repair small dings and dents on automobiles, and "characterized these dings and dents as occurring due to normal wear and tear."

67.    DFS recognized the relevance of Insurance Law § 7902(k), which defines a "service contract" as an agreement, for additional consideration, to perform repair or maintenance due to reasons which include "a defect in materials or workmanship or wear and tear."

68.    It concluded that the "accidental" "dings and dents" were due to the occurrence of "'fortuitous events,' as defined by Insurance Law § 1101," which provides: "'Fortuitous event' means any occurrence or failure to occur which is, or is assumed by the parties to be, to a substantial extent beyond the control of either party."

69.    A purported service contract – like Goof Proof or the Paintless Dent Repair Protection Plan:

> may not provide coverage for loss or damage arising out of an external cause except in the limited circumstances set forth in Insurance Law § 7902(k), which states that a service contact may provide coverage for the repair, replacement or maintenance of property for damage resulting from "accidental damage from handling."
>
> The Insurance Department has interpreted "accidental damage from handling" to mean accidental damage from handling in the normal and customary use of the product (here, the automobile). See Opinions of Office of General Counsel No. 06-03-04 (March 8, 2006) and No. 07-07-19 (July 23, 2007).
>
> However, coverage for accidental damage from handling may be made available only as incidental to coverage for defects. Id. In the instant matter, no coverage is being afforded for defects, so accidental damage from handling may not be covered.

70.    The purpose of this prohibition is to guard against the harm suffered by Plaintiffs and consumers.

71.    Since Goof Proof is based on the occurrence of admittedly "fortuitous events," New

York concluded that these types of plans are contracts of insurance.

72.   To permit the sale of products which are tantamount to insurance but without the protections and restrictions imposed on insurance contracts, is a public harm the legislature sought to prevent.

73.   The experiences of Plaintiffs fit squarely within the policy rationale for limiting the scope of service contracts for "accidental damage."

74.   This is because the issuing and insuring parties – Defendant Bob's and Defendant Guardian – can deny coverage to customers based on almost any basis.

75.   Rips, tears, breaks and punctures are described by Defendant Bob's and Defendant Guardian as "defects" for which Plaintiffs and class members were denied coverage.

76.   Plaintiffs and class members purchased purported service contracts to protect their furniture against "accidental damage."

77.   DFS considers damages to fabric and leather, and breaks, as being due to wear and tear or fortuity.

78.   While repeatedly getting into and up from a chair may cause wear over time, DFS recognized that a rip or tear or separation of material could occur due to a buckle or piece of a person's clothing digging into or catching onto the fabric, causing damage.

79.   Likewise for breakage of furniture's frame, as experienced by Plaintiff Glover.

80.   The latter scenario is fortuitous and would trigger classification of the service contract as an insurance contract.

81.   The frame on Plaintiff Glover's sofa did not break from wear and tear but due to inadvertent de minimis pressure applied upon Plaintiff Glover's leaning against the sofa.

82.   The leather situation is what occurred to Plaintiff Musella's chair.

83.    The leather was not ripped due to wear and tear, but due to the inadvertent attachment of clothing from a person using the chair, which became stuck, causing a small separation in the leather and fabric.

84.    This initial separation triggered the larger tear.

85.    The discount nature of the furniture creates extra incentive to purchase the Goof Proof products.

86.    This is because consumers know intuitively that lower-priced furniture may not be as sturdy or resistant to accidental stains or tears as higher-priced furniture.

87.    Therefore, it makes sense to spend extra on a warranty to cover these potential issues.

88.    Upon information and belief, Defendant Bob's receives incentives from Defendant Guardian for every warranty it sells to consumers.

89.    Defendant Bob's sales personnel receive bonuses for the number of Goof Proof products they sell.

90.    Defendant Bob's sales personnel can be penalized if they do not sell a specific number of Goof Proof products during a time-period.

91.    This creates an incentive for personnel to give consistently false misrepresentations about the nature, type, and extent of the Goof Proof products.

92.    In the instances of Plaintiff Glover and Plaintiff Musella, the salespersons conveyed that Goof Proof would cover "anything and everything," even when Plaintiff Glover and Plaintiff Musella asked questions about purchasing the coverage.

93.    Since the furniture is not of the highest quality, the Goof Proof plans are especially misleading and deceptive.

94.    This means Defendant Bob's and Defendant Guardian can more easily and unfairly

attribute any accidental stain or rip to a product defect, when there might be cause for overlap between what caused the damage.

95.    However, when customers submit claims for one of the covered reasons, they are denied with the explanation that the damage or stain was not "accidental," but due to misuse.

96.    Defendant Bob's and Defendant Guardian regularly deny claims if a customer cannot identify the exact date within a 30-day period when a stain or damage occurred.

97.    Not noticing a stain or damage on the day it occurred is a common circumstance, especially if the furniture is used by other persons within a household and not exclusively by the person who purchased the Goof Proof product or their authorized representative.

98.    Additionally, if there is more than one marking or puncture on the furniture, the claim will be denied on the basis that the item was "misused."

99.    However, it is not expected that a customer would submit a claim for the most minor and less visible markings or tears.

100.    Defendant Bob's and Defendant Guardian regularly deny claims based on the issue being categorized as "accumulated [stains/tears/etc]," "frame defects," "repetitive" or "preventable."

101.    Customers submit pictures of the items for which coverage is sought, and Defendant Bob's and Defendant Guardian will seek to identify other markings or rips, even in other areas of the furniture, and deny claims on this basis.

102.    Defendant Bob's and Defendant Guardian have not reasonably defined what types of stains, rips, etc., are "excessive" and the application of this criteria results in denial of valid claims.

103.    Defendant Bob's and Defendant Guardian encourage consumers to use cleaning

products sold and/or provided by Defendant Bob's, to attempt to remedy stains or markings.

104.  This delays the time within which customers file their claims, resulting in filing dates beyond the permitted 30 days.

105.  When consumers do submit claims, they face long waits to speak with representatives, are told they will be contacted by someone, and no one calls back.

106.  Calls by consumers such as Plaintiffs are often "disconnected" because the representatives of Defendant Bob's and Defendant Guardian are evaluated on the length of their calls with claimants.

107.  Customers must navigate confusing endless circular phone trees which lead to being disconnected.

108.  Defendant Bob's and Defendant Guardian's actions – the sale of insurance contracts as service contracts – causes harm to Plaintiffs and class members.

109.  Reasonable consumers must and do rely on a company to honestly identify and describe the components, attributes and features of a product or service being sold, relative to itself and other comparable products or alternatives.

110.  The value of the Goof Proof Products that plaintiffs purchased was materially less than its value as represented by Defendant Bob's and backed up by Defendant Guardian.

111.  Defendant Bob's sold more of the Goof Proof Products, and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

112.  Defendant Guardian reaped greater profits based on Defendant Bob's sale of more Goof Proof plans.

113.  Had Plaintiffs and proposed class members known the truth, they would not have

bought the Goof Proof plans or would have paid less for it.

Jurisdiction and Venue

114.   Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

115.   Upon information and belief, the aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

116.   Plaintiff Glover is a citizen of New York.

117.   Defendant Bob's Discount Furniture, LLC is a Delaware corporation with a principal place of business in Stamford, Fairfield County, Connecticut and upon information and belief, at least one member of defendant is not a citizen of the same state as the plaintiff Glover.

118.   The parties are citizens of different states.

119.   Venue is in this district because a substantial part of the events or omissions giving rise to the claim occurred here, Plaintiff Glover's residence in this district and within the Southern Division of this District, which is where she experienced the accidental damage to her purchase from Defendant Bob's, and it was in this Division where Defendant Guardian denied her claim submitted under the Goof Proof plan.

Parties

120.   Plaintiff Glover is a citizen of Bronx, Bronx County, New York.

121.   On February 16, 2017, Plaintiff Glover went to Defendant's store, 2500 Central Park Avenue, Yonkers, New York, 10710, to look at furniture.

122.   Plaintiff Glover purchased the Jennings Grey Power Reclining Sofa, Article 20023470003, for $998.00, with Goof Proof coverage.

123.   Plaintiff Musella is a citizen of Hewlett, Nassau County, New York.

124.   On September 2, 2017, Plaintiff Musella went to Defendant's store, 171-175 Old Country Road, Carle Place, New York, to look at furniture.

125.   Plaintiff Musella purchased the Phoenix Power Recliner, 1542-31, Article 20031794005, for $699.99, with Goof Proof coverage. Exhibit "B."

126.   Plaintiff Glover and Plaintiff Musella received Sales Receipts which listed their purchases, how much they paid, and who their salesperson was.

127.   At the bottom Plaintiff Glover's sales receipt, it states:

> **I acknowledge that the information on the above page(s) is accurate and that I have read and agree to the sale terms on the following page.**
>
> **Customer Signature _____**

128.   At the bottom Plaintiff Musella's sales receipt, it states:

> **The above information is accurate.**
>
> **Customer Signature _____**

129.   Beneath each section on their Sales Receipts, it states:

> For service after delivery please call Bob's Customer Care line at (860) 474-1000 or (800) 569-1284
>
> The information contained on the subsequent pages of this document is an integral part of the agreement between the buyer and the seller.

130.   Neither Plaintiff Glover nor Plaintiff Musella signed on the line for "Customer Signature."

131.   They were not required to sign at the bottom of this page, because they had already

made their payment to Defendant Bob's.

132. Insurance contracts of the type described here are exempt from arbitration requirements, even if Plaintiffs did sign the agreements, before their purchases, which they did not.

133. The salespersons whom they were working with did not ask them to sign at the bottom of this document, either before or after Plaintiffs paid the money for the items.

134. Plaintiffs were given these papers after their purchases without anything else required of them to complete the transaction.

135. The second page of the Sales Receipt for Plaintiff Glover and Plaintiff Musella contains a significant amount of text in small print, with the following headings:

- Cancellations, Returns and Refunds

- We're Delivering Your Furniture

- You're Picking Up Your Furniture

- Limited Warranty and Product Service Policy

- Goof Proof Protection

- Protecting Your Privacy; and

- Resolution of Disputes.

136. The second page of the Sales Receipts for Plaintiff Glover and Plaintiff Musella are almost identical.

137. The Goof Proof Protection section on each of their documents is identical, but for the identification of the company to whom accidental stains or damage to a mattress should be reported.

Bob's Goof Proof is the best way to protect your investment from a wide variety of

accidents for 5 years…If you purchased a Goof Proof Protection Plan and accidentally stain or damage your furniture then please report the mishap within 30 days of the accident. Call **Guardian** at (800) 538-9500 to report *accidental* stains or damage to your **furniture**. Call [**PureCare/FabricTech**] at (800) 758-8563 to report *accidental* stains or damage to your **mattress. Complete Goof Proof Plan Terms and Conditions** can be accessed at the www.mybobs.com home page by clicking the Bob's Goof Proof Plan link under Customer Care on the bottom left of the page.

138.  The Resolution of Disputes sections in each of their Sales Receipts are also very

similar.

139.  For Plaintiff Glover, the Resolution of Disputes section states:

Any controversy or claim between you and Bob's arising out of, or relating to, this agreement or any products or services purchased from Bob's shall be resolved by arbitration administered by the American Arbitration Association pursuant to its Consumer Arbitration Rules, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. You agree to waive your right to have a judge or jury decide your claim. You and Bob's further agree to bring any claim on an individual basis only. Neither you nor Bob's will serve as a class representative, join as a class member, or otherwise participate as a plaintiff in any class, mass, consolidated, or private attorney general action or arbitration.

140.  For Plaintiff Musella, the Resolution of Disputes section states:

Any and all claims and/or disputes between you and Bob's arising out of and/or related to this agreement, any products and/or services sold and/or purchased through Bob's, and/or any performance of any services related to this agreement must be resolved exclusively by final and binding arbitration before a single arbitrator pursuant to the rules of the American Arbitration Association ("AAA"). The parties shall split the costs of arbitration and each party shall bear its own legal fees. This does not change your substantive rights, rather just the potential forums where your disputes can be resolved.

This agreement to arbitrate includes all disputes regardless of their nature, whether legal or equitable, and whether sounding in tort, contract, statute, regulation, or otherwise. Arbitration is different. There is no judge or jury, but the arbitrator can award damages and relief. Your agreement to arbitration results in your knowing and voluntary waiver of any rights to maintain other available resolution processes, such as court actions or administrative proceedings.

And, you specifically waive your legal right to go to court and have any dispute heard by a judge or jury. Further, you and Bob's agree that each of us may bring claims against the other only on an individual basis and not as a plaintiff or class member in any purported class, or representative or private attorney general action

or proceeding. Unless both you and Bob's agree otherwise, the arbitrator may not consolidate or join more than one person's or party's claims, and may not otherwise preside over any form of a consolidated, representative, class, or private attorney general action or proceeding.

141.  The difference is that Plaintiff Musella's arbitration clause is broader and contains unconscionable provisions that require she split the costs of the arbitration with Defendant.

142.  Nevertheless, neither Plaintiff Glover or Plaintiff Musella were required to sign, nor did they sign, the Sales Receipts which would have purportedly been their acknowledgement and acceptance of the terms of the Resolution of Disputes provided for.

143.  Instead, Plaintiffs were presented with these documents after they had already completed their purchases, which is evident because these terms are present on the physical receipts, which could only be generated after their payment information was processed and applied to their purchases.

144.  Defendant Bob's Discount Furniture, LLC, is a Delaware limited liability company with a principal place of business in Stamford, Connecticut, Fairfield County.

145.  Defendant Guardian Protection Products, Inc., is a North Carolina corporation with a principal place of business in North Carolina.

146.  Plaintiffs relied on the representations that the Goof Proof plans would cover the incidents on which they sought coverage – from accidental damage.

147.  Plaintiffs would not have purchased the Goof Proof plans if they knew the representations were false and misleading.

148.  Plaintiffs were convinced and persuaded to buy the Goof Proof plans based on uniform representations made to them by Defendant Bob's salespersons.

149.  Defendant Bob's provides its sales personnel with handbooks which contain information with which to allay customer concerns about purchasing additional protection and to

convert them to purchasing the Goof Proof plans.

150.  The Goof Proof plans were worth less than what Plaintiffs paid and they would not have paid as much absent the false and misleading statements and omissions.

151.  Plaintiffs intend to, seek to, and will purchase the Goof Proof plans again when they can do so with the assurance that the representations are consistent with the coverage they will receive.

Class Allegations

152.  The class will consist of New York residents who purchased the Goof Proof plans during the statutes of limitations for each cause of action alleged.

153.  Common questions of law or fact predominate and include whether the representations of Defendant Bob's were and are misleading with respect to what the Goof Proof plans would cover, and whether Defendant Guardian knowingly failed to honor claims submitted under the Goof Proof plans, and if plaintiffs and class members are entitled to damages.

154.  Plaintiffs' claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

155.  Plaintiffs are adequate representative because their interests do not conflict with other members.

156.  No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

157.  Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

158.  Plaintiffs' counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

159.  Plaintiffs seek class-wide injunctive relief because the practices continue.

New York General Business Law ("GBL") §§ 349 & 350

(Consumer Protection Statute)

160.  Plaintiffs incorporate by reference all preceding paragraphs.

161.  Defendant Bob's and Defendant Guardian's false and deceptive representations, claim practices, and omissions are material in that they are likely to influence consumer purchasing decisions.

162.  Defendant Bob's misrepresented the Goof Proof plans through statements, omissions, ambiguities, half-truths and/or actions.

163.  Defendant Guardian abetted the misrepresentations made by Defendant Bob's, by, upon information and belief, furnishing material and talking points, to be used by salespersons to sell more Goof Proof products.

164.  Defendant Guardian denied claims in bad faith when it knew it should have honored the claims.

165.  Plaintiffs relied on the representations of Defendant Bob's.

166.  Plaintiffs and class members would not have purchased the Goof Proof plans or paid as much if the true facts had been known, suffering damages.

Breach of Contract

167.  Defendant Bob's and Defendant Guardian created contracts with Plaintiffs.

168.  The contracts were for the sale of insurance in the form of service contracts.

169.  Defendant Bob's and Defendant Guardian breached the insurance contracts with Plaintiffs by denying their claims for coverage.

Breach of Express Warranty,
Implied Warranty of Merchantability and

<u>Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*</u>

170.  The Goof Proof plans were marketed and sold by defendant Bob's, with assistance from Defendant Guardian, and expressly and impliedly warranted to plaintiffs and class members as able to cover the events they sought coverage for.

171.  Defendant Bob's and Defendant Guardian had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Goof Proof plans.

172.  This duty is based on Defendant Bob's and Defendant Guardian's outsized role in the market for this type of "service contract," as each held a substantial amount of public trust in this area.

173.  Plaintiffs provided or will provide notice to Defendant Bob's and Defendant Guardian's, their agents, representatives, retailers, and their employees.

174.  Defendant Bob's and Defendant Guardian received notice and should have been aware of these issues due to complaints by regulators, competitors, and consumers, to their main offices.

175.  The Goof Proof plans did not conform to their affirmations of fact and promises due to Defendant Bob's and Defendant Guardian's actions and were not merchantable because they were not fit to pass in the trade as advertised.

176.  Plaintiffs and class members would not have purchased the Goof Proof plans or paid as much if the true facts had been known, suffering damages.

<u>Negligent Misrepresentation</u>

177.  Defendant Bob's and Defendant Guardian had a duty to truthfully represent the Goof Proof plans, which it breached.

178.  This duty is based on defendant Bob's and defendant Guardian's position, holding themselves out as having special knowledge and experience this area.

179.  The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in defendant Bob's and defendant Guardian.

180.  Plaintiffs and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Goof Proof plans.

181.  Plaintiffs and class members would not have purchased the Goof Proof plans or paid as much if the true facts had been known, suffering damages.

Fraud

182.  Defendant Bob's misrepresented and/or omitted the attributes and qualities of the Goof Proof plans.

183.  Defendant Guardian intentionally denied claims based on their manuals which contained information on how accidental damage could be recharacterized as attributable to wear-and-tear and other causes for which consumers would not receive coverage.

184.  Defendant Guardian promoted and rewarded its employees who were able to process the most claims in definitive periods of time, even though it knew this metric would result in denial of valid claims.

185.  Defendant Bob's and Defendant Guardian's fraudulent intent is evinced by their knowledge that the Goof Proof plans were not consistent with its representations and claim processing.

Unjust Enrichment

186.  Defendant Bob's and Defendant Guardian obtained benefits and monies because the Goof Proof plans was not as represented and expected, to the detriment and impoverishment of plaintiffs and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiffs demand a jury trial on all issues.

**WHEREFORE**, Plaintiffs pray for judgment:

1. Declaring this a proper class action, certifying plaintiffs as representatives and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiffs' attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   September 23, 2021

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
60 Cuttermill Rd Ste 409
Great Neck NY 11021-3104
Tel: (516) 268-7080
Fax: (516) 234-7800
spencer@spencersheehan.com